# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 16, 2022

Lyle W. Cayce
Clerk

———————

No. 20-40334

———————

Juan Carlos Salazar,

*Plaintiff—Appellee*,

*versus*

Juan Rene Molina, *Deputy, Zapata County Sheriff's Office*,

*Defendant—Appellant*.

———————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:16-cv-292

———————

Before Smith, Elrod, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

Juan Salazar led police on a high-speed chase through a residential neighborhood. After Salazar stopped his vehicle, a sheriff's deputy tased and handcuffed him. Salazar sued the deputy, arguing that the tasing violated his Fourth Amendment rights. At summary judgment, the district court denied qualified immunity to the deputy. We reverse and render.

No. 20-40334

## I.

## A.

This case involves a high-speed car chase, which officers captured on a dashcam video. We therefore "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022) ("[W]e assign greater weight, even at the summary judgment stage, to the video recording taken at the scene." (quotation omitted)); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("A court of appeals need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape." (quotation omitted)).

Around 2:00 a.m. on March 1, 2014, a Zapata County sheriff's deputy tried to pull over Juan Carlos Salazar for speeding. Instead of stopping, Salazar accelerated and led police on a high-speed chase for approximately five minutes. At one point, Salazar traveled in excess of 70 miles per hour on a narrow residential street.

Eventually, two vehicles pulled in front of Salazar's path, blocking his way forward. Salazar abruptly stopped his vehicle. He quickly got out, dropped to his knees next to the car, and raised his hands. He then lay on the ground with arms above his head and legs crossed. Five seconds after stopping his car, Salazar was lying prone on the ground.

Just as Salazar finished lowering himself to the ground, Deputy Juan Molina brought his patrol car to a stop behind Salazar's vehicle. Molina exited his vehicle and ran toward Salazar. Salazar remained on the ground but uncrossed his legs two seconds before Molina got to him. Upon reaching Salazar—eight seconds after Salazar had stopped his car—Molina fired his taser at Salazar's back.

No. 20-40334

The video shows that Salazar tensed up and his upper body shook for approximately six seconds. Molina says he deployed his taser just once, shocking Salazar for one five-second cycle. Salazar contends that Molina kept his finger on the taser and triggered a second cycle, tasing Salazar for a total of ten seconds.

After the tasing, Molina removed the taser prongs from Salazar's back and handcuffed Salazar. Then he helped Salazar up and walked him to a patrol car. Salazar was back on his feet less than a minute after lying down next to his car.

B.

Salazar sued Molina, along with various other officers and governmental entities. As relevant to this appeal, Salazar alleged that Molina's use of the taser constituted excessive force and therefore violated his Fourth Amendment right against unreasonable seizures. *See* U.S. Const. amend. IV; *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (incorporating the Fourth Amendment against the States). Salazar sought damages under 42 U.S.C. § 1983.

Molina moved for summary judgment on Salazar's excessive-force claim, arguing that he was entitled to qualified immunity. The district court denied Molina's motion. The court held there were material factual disputes as to whether a reasonable officer would have viewed Salazar as an immediate threat; whether Salazar's apparent surrender was a ploy to evade arrest; and whether Salazar was tased once or twice. The court also concluded that the "law on the excessive use of force as it applies to tasers was clearly established" at the time of the tasing.

Molina timely appealed the denial of his summary-judgment motion. Our review is *de novo*. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).

No. 20-40334

## II.

Salazar seeks money damages from a law enforcement officer. To win them, he must overcome qualified immunity. That means he must show (A) that Molina violated his constitutional rights and (B) that the right at issue was "clearly established" at the time of the alleged misconduct. *Morrow*, 917 F.3d at 874. Salazar can't make either showing.

## A.

The Fourth Amendment prohibits "unreasonable . . . seizures." Salazar concedes that Molina had the right to seize—*i.e.*, arrest—him after his high-speed flight from police. But Salazar contends that Molina's seizure was unreasonable because Molina used excessive force.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Court emphasized that our excessive-force inquiry must be fact-intensive. *See id.* at 396–97. It "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. We must also account for "the degree of force" the officer used, because "the permissible degree of force depends on the *Graham* factors." *Cooper v. Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016) (quotation omitted). Moreover:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97.

4

No. 20-40334

The first *Graham* factor is "the severity of the crime at issue." *Id.* at 396. Salazar led police on a dangerous car chase through a residential area and was charged with the felony of evading arrest with a vehicle. The district court accordingly found that the first *Graham* factor weighed against a finding of excessive force. It further noted that "leading law enforcement in a high-speed chase through a heavily populated area is a serious crime that puts at risk not only the lives of Plaintiff and the officers but also those of the general public." This finding comports with our cases, which have found far less dangerous offenses to be "serious" for purposes of the first *Graham* factor. *E.g.*, *Cooper*, 844 F.3d at 522 (DUI); *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016) (DUI and interfering with the duties of a public servant). Salazar does not dispute the severity of his offense.

The second *Graham* factor is "whether the suspect poses an immediate threat to the safety of the officers or others." 490 U.S. at 396. Salazar argues that a jury could easily find that he posed no threat to anyone's safety when Molina tased him. That's so, on Salazar's view, because (1) Salazar was not suspected of a violent offense; (2) Salazar adopted a non-threatening position of surrender after exiting his vehicle; and (3) Molina could see Salazar's hands and tell that he was not wielding a weapon. The district court agreed and held that "there are genuine factual disputes as to whether [Salazar] posed an immediate threat to the safety of anyone at the scene."

We disagree because Salazar's position comports with neither common sense nor our precedent. First, as a matter of common sense, what preceded the surrender matters. A reasonable officer will have little cause to doubt the apparent surrender of a compliant suspect who has not engaged in dangerous or evasive behavior. But when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a

ploy. That's especially true when a suspect is unrestrained, in close proximity to the officers, and potentially in possession of a weapon.

Second, precedent forecloses Salazar's argument that Molina could no longer reasonably fear for his safety and justifiably use any force once Salazar purported to surrender. To the contrary, we've repeatedly refused to hold that "*any* application of force to a compliant arrestee is *per se* unreasonable." *Escobar v. Montee*, 895 F.3d 387, 394–95 (5th Cir. 2018) (quotation omitted); *Cooper*, 844 F.3d at 524. *Escobar* is instructive. There, an officer allowed his police dog to bite a suspect for a full minute—even after the suspect, "in an attempt to convey his surrender," "dropped his knife and la[id] flat on the ground 'like a parachute man.'" 895 F.3d at 390–91. We still granted the officer qualified immunity. That's because, despite the apparent surrender, other circumstances indicated the suspect might still be a threat. These included: (1) the suspect had committed a felony; (2) he had sought to evade police for 20 minutes; (3) it was nighttime; (4) the suspect had a knife within reach, even though he had dropped it; and (5) the officer had been warned that the suspect was dangerous. *See id.* at 394–95; *see also Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (per curiam) (determining in similar circumstances that "[e]ven assuming, as we must, that Crenshaw was legitimately attempting to surrender, it was objectively reasonable for Lister to question the sincerity of Crenshaw's attempt to do so" because Crenshaw "up to that point, had shown anything but an intention of surrendering").

As *Escobar* illustrates, a suspect cannot refuse to surrender and instead lead police on a dangerous hot pursuit—and then turn around, appear to surrender, and receive the same Fourth Amendment protection from

No. 20-40334

intermediate force[1] he would have received had he promptly surrendered in the first place. Like *Escobar*, this case involves a fleeing felony suspect who eventually decided to surrender and was then temporarily subjected to intermediate force.

Salazar makes several attempts to distinguish *Escobar*, but none is persuasive. First, Salazar argues that unlike in *Escobar*, he didn't pose a threat to officers because he "unambiguously surrender[ed]" before being tased. But again, the rule is not that an "unambiguous surrender" negates any threat posed by a previously hostile suspect. If that were the case, *Escobar* would have come out the other way, because Escobar laid down with his hands visible and complied with the officer's commands before being bitten. *See* 895 F.3d at 394–95. Rather, the relevant inquiry is whether—despite the *appearance* of unambiguous surrender—"an officer [would] have reason to doubt the suspect's compliance and still perceive a threat." *Id.* at 395.

Second, Salazar relies on *Lytle v. Bexar County*, 560 F.3d 404 (5th Cir. 2009), where we stated that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Id.* at 413; *see also Amador v. Vasquez*, 961 F.3d 721, 730 (5th Cir. 2020) (citing *Lytle* for this same principle). In *Lytle*, we denied qualified immunity to an officer who shot and killed a passenger in a vehicle driving away from the officer some three or four houses down a residential block. 560 F.3d at 412–13. Seconds earlier, the vehicle had been much closer and backing up toward the officer. But, we held, that didn't justify shooting at the vehicle after the vehicle was moving away from the officer and was several hundred feet away. *See id.* at 413–14.

---

[1] This broad category of non-deadly force includes weapons such as police dogs and tasers.

Notably, *Lytle* reaffirmed that the relevant "justification for the use of force" is the officer's reasonable perception of a threat of harm. *Ibid.* And this does *not* always require that a suspect be actively resisting, fleeing, or attacking an officer at the precise moment force is used. *See id.* at 414 (noting that it's reasonable to use defensive force where insufficient time has elapsed "for the officer to perceive new information indicating the threat was past" (quotation omitted)). Instead, the relevant inquiry is whether the officer used a justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive. In *Lytle*, we said deadly force was unjustified because the vehicle was hundreds of feet away and driving away from the officer. *See ibid.*; *see also Amador*, 961 F.3d at 730 (similar analysis where officers shot and killed a suspect standing motionless 30 feet away with his hands in the air). But that says little about the reasonableness of using a taser on a previously noncompliant suspect in close physical proximity to officers.

Finally, Salazar tries to distinguish *Escobar* on the facts. He correctly points out several factual differences between this case and *Escobar*—most significantly, Molina couldn't see a weapon nearby, and Molina had not been warned that Salazar was dangerous before the incident. But on the other hand, cartel activity near the scene and the presence of bystanders made the situation Molina confronted more dangerous than the one in *Escobar*. And the force deployed here was substantially less than that used in *Escobar*—a 10-second tasing before handcuffing rather than 60 seconds of dog biting that continued until the suspect was fully handcuffed. *See also Cooper*, 844 F.3d at 521 (denying qualified immunity where an officer subjected a DUI suspect who had previously fled on foot to more than a full minute of dog biting). Accordingly, Salazar's efforts to distinguish *Escobar* are unpersuasive, and that precedent reinforces our conclusion that the second *Graham* factor favors Deputy Molina.

No. 20-40334

The third *Graham* factor is "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The parties agree that the second and third *Graham* factors implicate the same facts, including whether Molina could have reasonably been concerned that Salazar's surrender was not genuine. *See Escobar*, 895 F.3d at 396 ("[T]he third *Graham* factor . . . largely folds into the second. If [the suspect] may have posed a threat, then he also might have attempted to flee."). To the extent that there are considerations uniquely relevant to the third factor, they support the reasonableness of the tasing. Salazar had just spent five minutes "attempting to evade arrest by flight" in a highly dangerous manner. *Graham*, 490 U.S. at 396. And after stopping his car, Salazar quickly exited it without a command and looked toward an open area—rather than staying in his vehicle and awaiting a command. If anything, these facts made it just as reasonable for Molina to fear that Salazar still sought to escape as it was for Molina to fear that Salazar was a threat to his or others' safety. The third *Graham* factor thus also supports the reasonableness of Molina's use of his taser.

When Molina made the split-second decision to deploy his taser, Salazar had just committed a dangerous felony and was unrestrained at night in the open. Because of the preceding high-speed chase, Molina could reasonably be concerned about the sincerity of Salazar's purported surrender. And the totality of the force deployed—a 10-second tasing—was comparatively modest and not grossly disproportionate to the threat Molina could have reasonably perceived. We hold that Molina's conduct did not amount to an unreasonable seizure under the Fourth Amendment.

B.

On the undisputed facts before us, Salazar cannot show that Molina violated his Fourth Amendment rights. But even if he could, Molina would

9

No. 20-40334

nonetheless be entitled to qualified immunity because Salazar can't show a violation of clearly established law.[2] We (1) explain what it takes to show clearly established law, and then we (2) hold that Salazar hasn't made that showing.

1.

Qualified immunity allows law enforcement officers to avoid personal liability and the burdens of defending suit unless their conduct violates a clearly established constitutional right. It "protects all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (quotation omitted). To overcome a qualified immunity defense, the "plaintiff has the burden to point out clearly established law" and also "bears the burden of raising a fact issue as to its violation." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) (quotation omitted).

"[T]he Supreme Court has repeatedly instructed that clearly established law is *not* to be defined at a high level of generality. This is particularly true in recent years." *Ibid.* A panel of our court wrote those words in May 2021. Five months later, the Supreme Court reinforced that instruction in two strongly worded summary reversals holding that defendants in excessive-force § 1983 suits were entitled to qualified immunity because their conduct did not violate clearly established law. The first, *City of Tahlequah*, reiterated:

> We have repeatedly told courts not to define clearly established
> law at too high a level of generality. It is not enough that a rule
> be suggested by then-existing precedent; the rule's contours

---

[2] "This circuit follows the rule that alternative holdings are binding precedent and not obiter dictum." *Jarkesy v. SEC*, 34 F.4th 446, 459 n.9 (5th Cir. 2022) (quotation omitted).

No. 20-40334

> must be so well defined that it is clear to a reasonable officer
> that his conduct was unlawful in the situation he confronted.

142 S. Ct. at 11 (quotation omitted). The second case, *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam), explained:

> A right is clearly established when it is sufficiently clear that
> every reasonable official would have understood that what he
> is doing violates that right. Although this Court's case law does
> not require a case directly on point for a right to be clearly
> established, existing precedent must have placed the statutory
> or constitutional question beyond debate. This inquiry must be
> undertaken in light of the specific context of the case, not as a
> broad general proposition.

*Id.* at 7–8 (quotation omitted).

"Specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 8 (quotation omitted). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quotation omitted). So "to show a violation of clearly established law, [Salazar] must identify a case that put [Molina] on notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. As we put it in another excessive-force case involving a high-speed chase, "the law must be *so* clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Morrow*, 917 F.3d at 876.

Salazar frames the applicable inquiry somewhat differently. He points to *Hope v. Pelzer*, 536 U.S. 730 (2002), an Eighth Amendment case, as well as Fifth Circuit decisions that relied on *Hope* and predated *City of Tahlequah* and

*Rivas-Villegas*. For example, Salazar relies on *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013), which emphasized *Hope*'s statement that law can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court." *Id.* at 379 (quotation omitted). Salazar similarly relies on *Amador*, which quoted *Hope* for the propositions that "[t]he salient question is . . . fair warning" and "[g]eneral statements of the law are not inherently incapable of giving fair and clear warning" to officers. *Amador*, 961 F.3d at 729–30 (quoting *Hope*, 536 U.S. at 741) (alteration omitted).

Salazar is correct to some extent. It's true *Hope* established that a plaintiff need not identify an on-point case to overcome qualified immunity when a violation is "obvious." 536 U.S. at 741; *see also Kisela*, 138 S. Ct. at 1153. But Salazar does not argue that this case is obvious. Accordingly, Molina is "entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153. Moreover, Salazar must identify precedent placing the constitutional question "beyond debate" such that the answer would immediately be apparent to every reasonable officer. *Rivas-Villegas*, 142 S. Ct. at 8; *see also Morrow*, 917 F.3d at 876–77.

2.

We proceed to consider whether Salazar has made the required showing to overcome qualified immunity. By citing no factually similar Supreme Court cases, Salazar effectively concedes that Supreme Court precedent offers him no help. He turns instead to Fifth Circuit excessive-force cases. Even on the assumption that Fifth Circuit precedent can create clearly established law, *see Rivas-Villegas*, 142 S. Ct. at 7 (assuming the proposition), none of Salazar's cases is a close enough fit.

Three of Salazar's cases are unpublished and non-precedential. *See Clark v. Massengill*, 641 F. App'x 418 (5th Cir. 2016); *Byrd v. City of Bossier*, 624 F. App'x 899 (5th Cir. 2015) (per curiam); *Anderson v. McCaleb*, 480 F. App'x 768 (5th Cir. 2012) (per curiam). For a right to be clearly established, however, "existing *precedent* must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas*, 142 S. Ct. at 8 (emphasis added) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). "Because nonprecedential opinions do not establish any binding law for the circuit, they cannot be the source of clearly established law for qualified immunity analysis." *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (quotation omitted); *see also Bell v. City of Southfield*, --- F.4th ---, --- (6th Cir. 2022) (Thapar, J.) (holding that "a plaintiff cannot point to unpublished decisions" to show clearly established law).

Salazar's fourth case, *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012), cannot clearly establish the law because the court found no Fourth Amendment violation. *Id.* at 629; *see Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) ("[T]o clearly establish the violative nature of an officer's conduct, a prior decision must at least hold there was some violation of the Fourth Amendment."). His fifth case, *Amador*, was decided in 2020 and addressed a 2015 incident. 961 F.3d at 724. So *Amador* cannot show clearly established law at "the time of the violation" Salazar alleges here—March 1, 2014. *Id.* at 727; *see also Kisela*, 138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious."). And Salazar's sixth case, *Peña v. City of Rio Grande City*, 879 F.3d 613 (5th

Cir. 2018), is irrelevant because the court did not address the issue of qualified immunity. *Id.* at 621.[3]

Two more of Salazar's cases do not involve tasing or fleeing; Salazar instead relies on them for general statements of the law governing excessive-force claims. *See Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (applying the *Graham* factors to deny qualified immunity to an officer who "forcefully slam[med arrestee's] face into a vehicle while she was restrained and subdued"); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (applying the *Graham* factors to deny qualified immunity on an excessive-force claim where an officer, after "very little, if any, negotiation" with an arrestee, "resorted to breaking her driver's side window and dragging her out of [her] vehicle"). From these cases, Salazar infers a rule that an officer violates clearly established law if he uses intermediate force before negotiating when a suspect is restrained, subdued, and not fleeing. This rule, even if correct, wouldn't apply here because Salazar wasn't restrained when he was tased. Just as importantly, positing this kind of general rule is insufficient to show clearly established law. *See Kisela*, 138 S. Ct. at 1153 ("[O]fficers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (quotation omitted)).

That leaves Salazar with four cases: *Ramirez*; *Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015); *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012);

---

[3] Even if the threshold barriers to considering these six cases could be overcome, it's doubtful that any involves sufficiently similar facts to this case to clearly establish that Molina's conduct was unlawful. Two of them—*Massengill* and *Anderson*—involved the use of a taser against a previously fleeing suspect. But both cases involved far more extreme uses of force than here. *See Massengill*, 641 F. App'x at 421 (suspect had already been bitten repeatedly by a police dog and submitted before the tasing); *Anderson*, 480 F. App'x at 769 (suspect tased five or six times, hit with a closed fist, and slammed on the ground—all after attempting to surrender).

and *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018). The key question is whether those decisions would have made it clear to every reasonable officer that he could not tase Salazar in the specific circumstances Molina confronted. *See Morrow*, 917 F.3d at 876.

According to Salazar, *Ramirez* establishes that tasing a suspect who is not actively resisting is unlawful. *Ramirez* involved the execution of an arrest warrant for Reynaldo Ramirez's sister-in-law at Ramirez's business. 716 F.3d at 372. Ramirez arrived at his business while the warrant was being executed and began arguing with a deputy. *Ibid.* The deputy told Ramirez to turn around and put his hands behind his back; when Ramirez refused, the deputy tased him and (with the help of other deputies) forced him to the ground. *Id.* at 372–73. The deputy restrained him and then "tased Ramirez a second time while lying face-down on the ground in handcuffs." *Id.* at 373. The court found that the deputy was not entitled to qualified immunity, relying primarily on the fact that "a reasonable officer could not have concluded Ramirez posed an immediate threat to the safety of the officers by questioning their presence at his place of business or l[y]ing on the ground in handcuffs." *Id.* at 378. Although *Ramirez* also involved the tasing of a suspect resisting arrest, the facts in that case are not similar enough to those here. Unlike here, Ramirez found deputies at his business and questioned them— he did not lead officers on a dangerous high-speed car chase. And unlike here, the officers tased Ramirez even after he was restrained with handcuffs. Both distinctions are material to the *Graham* analysis, which considers the severity of the crime at issue and the threat posed by the suspect. *Ramirez* thus does not show that any reasonable officer would have known tasing Salazar under these circumstances was unlawful.

Salazar's reliance on *Carroll* is similarly misplaced. In *Carroll*, an officer followed Herman Barnes into his home because he suspected Barnes of vandalizing mailboxes. 800 F.3d at 162–63. When Barnes refused to get

onto the ground, that officer and subsequently arriving officers engaged in a long struggle to subdue Barnes, including 35 taser cycles and numerous strikes. *Id.* at 165–66. Barnes died after the altercation. *Id.* at 166. The court granted the officers qualified immunity for the force used before "Barnes was tackled to the ground, handcuffed, and held down and surrounded by several deputies." *Id.* at 176; *see also id.* at 174–76. But because there was a fact issue as to whether the use of force persisted after that point, the court found that "the deputies are not entitled to qualified immunity as a matter of law for injuries Barnes sustained after he was handcuffed and restrained and after he stopped resisting arrest." *Id.* at 177. As with *Ramirez*, *Carroll* does not support Salazar's position because Salazar was not subjected to the use of additional force after he was handcuffed and subdued.

Salazar's next case is *Newman*. Derrick Newman was a passenger in a vehicle that was pulled over for failing to yield. 703 F.3d at 759. An officer discovered that a different passenger in the car had an outstanding warrant for unpaid traffic tickets and began to arrest him. *Ibid.* Newman exited the car and consented to a protective pat-down search. *Id.* at 759–60. On Newman's telling, he complied with all commands, but after he merely made an off-color joke, the officers beat him 13 times with a baton and tased him three times. *Id.* at 760. This court held that the officers were not entitled to qualified immunity, noting that "[n]one of the *Graham* factors justifie[d] . . . tasering Newman." *Id.* at 764. Specifically, "on Newman's account, he committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command." *Ibid.* Because *Newman* involved a plaintiff who committed no crime and obeyed all commands, that case cannot clearly establish that using a taser was unlawful in the circumstances Molina confronted here.

Salazar's last case is *Darden*. In that case, while making an arrest at a private residence, "officers allegedly threw [the arrestee] to the ground,

tased him twice, choked him, punched and kicked him in the face, pushed him into a face-down position, pressed his face into the ground, and pulled his hands behind his back to handcuff him." *Darden*, 880 F.3d at 725. As a result, the arrestee had a heart attack and died during the arrest. *Ibid.* The force used in *Darden*—causing the death of the arrestee—is obviously much more extreme than the 10-second tasing at issue here. Moreover, the arrestee in *Darden* "was not suspected of committing a violent offense." *Id.* at 729 (quoting *Cooper*, 844 F.3d at 522). Given that Molina encountered a more threatening situation—outside at night, with a suspect who had just committed a dangerous felony—and used far less force, *Darden* cannot clearly establish that Molina's conduct in these specific circumstances was unlawful.

To generalize a bit, all four of Salazar's tasing-related cases share two characteristics that make them materially different from this case. First, they all involved far less-threatening circumstances than here—in none of them was the plaintiff suspected of a dangerous felony, and in two of them the plaintiff was suspected of no crime at all. Nor had the plaintiff just attempted to flee from officers. Second, all four involved far more force than was deployed here—so much force, in fact, that it killed two of the arrestees. Salazar points to no case where officers used a similar level of force in similarly threatening circumstances. And because this is an excessive-force case that required a split-second judgment, Salazar can only win if "the law [was] *so* clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Morrow*, 917 F.3d at 876. Salazar cannot meet that burden, so Molina is entitled to qualified immunity.

\*    \*    \*

No. 20-40334

The judgment of the district court is REVERSED, and judgment is RENDERED for Deputy Molina.