# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 24, 2023

Lyle W. Cayce
Clerk

_____

No. 20-50945
_____

Andre D. Boyd,

*Plaintiff—Appellant*,

*versus*

Sheriff Parnell McNamara; Ricky Armstrong, *Administrator, McLennan County Jail*; Robert Dillard, *Grievance Officer, McLennan County Jail*; Officer Jeremy Johnson,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:19-CV-634

_____

Before Elrod, Ho, and Oldham, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Plaintiff Andre Boyd was repeatedly tased while he was a pretrial detainee at the McLennan County jail in Waco, Texas. Boyd insists that he did nothing to warrant the use of force—that he was neither threatening nor resisting the officer who tased him. The principal question on appeal is whether Boyd has presented sufficient evidence to defeat summary judgment on his ensuing civil rights claims.

No. 20-50945

He has.  The evidence is at least consistent with Boyd's account of what took place, and our precedents conclusively establish that the use of a taser on a non-threatening and cooperative subject is an unconstitutionally excessive use of force.  We therefore reverse in part and remand.[1]

I

The following facts are recounted, as they must be at summary judgment, in the light most favorable to Boyd.  "In other words, the story that follows is one-sided because the posture of the case requires it to be." *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019).

Boyd arrived at the McLennan County jail with an injury to his left hand "arising from his arrest."  He submitted a request for medical attention and was seen by a member of the jail's staff a few days later.  While observing the examination, Officer Jeremy Johnson discovered that Boyd's identification armband had been damaged.  Johnson asked Boyd to surrender the broken band, and Boyd complied "without incident" before being escorted back to the cell where he and other detainees were being held.

Boyd later approached the bars separating him from Johnson to ask Johnson if he was going to be "charged" for the armband.  Johnson responded that Boyd would be disciplined based on Johnson's belief that Boyd had intentionally shaved the rivet holding the band together.  Boyd protested that the damage to the armband was unintentional, contending that it had been ripped when it got caught on his bunk.  According to Boyd, Johnson proceeded to "call [Boyd] all types of lies, saying he could tell the

---

[1] Defendants' motion to dismiss for lack of jurisdiction based on the timeliness of Boyd's notice of appeal is denied.  We construe Boyd's Rule 59(e) motion as one successfully seeking an extension of time to file a notice of appeal. *See Rivers v. Lumpkin*, No. 18-11490, 2022 WL 1517027 (5th Cir. May 13, 2022).

rivet had been shaved," to which Boyd responded, "don't call me no 'motherf-----g liar.'"

What happened next is captured on video. The following is Boyd's account of what that video depicts:

> Johnson instructed Boyd to walk to the cell door and submit himself to be handcuffed and escorted out of the dayroom [cell]. Boyd complied. As both videos reflect, Boyd walked calmly to the cell door, turned around so that he was facing away from the door, and placed his hands behind his back. Officer Johnson removed handcuffs from his belt, opened the cell door, and then forcefully grabbed Boyd's left hand—*i.e.*, the hand with the fractured pinky finger that Johnson watched the nurse examine just moments earlier. Boyd, understandably, pulled his hand away in pain. He stepped away from Johnson, pointed to his left hand, and pleaded with Johnson not to grab that hand again and to instead grab his wrist when securing the handcuffs. Boyd then returned to his previous position, with his back to Johnson and his hands behind his back, ready to be handcuffed. Four seconds passed, with Boyd continuing to stand with his back to Johnson and his hands behind his back, speaking to Johnson over his left shoulder.
>
> Instead of handcuffing the compliant Boyd, Johnson fired his taser. He struck Boyd in the back of his left shoulder. Immediately afterwards, Johnson "drive stun" tased Boyd in the back of his right thigh. As Johnson's Taser Use Form indicates, the taser strikes were entirely on the backside of Boyd's body.
>
> The force of the taser being pressed against the back of Boyd's thigh pushed him into the dayroom cell, with Johnson (who is significantly larger than the 5' 4" Boyd), continuing to press the taser against his thigh. When the taser's five-second cycle completed, Johnson stepped away from Boyd. Boyd managed to remove one taser barb from his back, and then stood still with

No. 20-50945

> his back to Johnson, hands behind his back. Two other officers then entered the cell, one of whom placed handcuffs on the still-compliant Boyd . . . and escorted him out.

Blue Br. 6–8 (citations and figure omitted).

Defendants' account varies from Boyd's in two important ways. Defendants contend that, after Johnson grabbed his injured hand and Boyd jerked it away, Boyd not only twisted his head to speak to Johnson over his left shoulder, but also moved his right arm out of Officer Johnson's reach. More significantly, Defendants maintain that Boyd became agitated and threatening toward Johnson after Johnson grabbed his hand, stating that Boyd gestured in an agitated manner and yelled at Johnson.

The video evidence is consistent with both parties' accounts, though obstructions and the lack of audio make it impossible to determine what was said between Boyd and Johnson in the seconds preceding Johnson's decision to tase Boyd. The video does, however, clearly show that Boyd had his back to Johnson when Johnson fired his taser, and while Boyd appears to be twisting his body to speak to Johnson over his left shoulder, there is nothing overtly threatening about Boyd's stance. Boyd's hands remain behind his back, suggesting that he had submitted himself to be handcuffed before the taser was deployed.

After exhausting his administrative remedies, Boyd filed a *pro se* complaint against Johnson and other jail officials in the Western District of Texas, bringing claims under 42 U.S.C. § 1983. As relevant here, the operative complaint alleged that (1) Johnson's use of the taser constituted excessive force; (2) Defendants were deliberately indifferent to Boyd's medical needs; (3) Defendants, in their official capacities as policy makers for McLennan County, have a policy, custom, or practice of using excessive

force against black and Hispanic inmates; and (4) Defendants, in their individual capacities, instituted that unconstitutional policy.

Defendants moved to dismiss and asked the district court to stay all discovery pending resolution of their qualified immunity defenses. The district court issued an order notifying the parties that it would treat Defendants' motion as a motion for summary judgment and allowed additional time for discovery. But when Boyd issued his discovery requests, Defendants again moved to stay discovery or, in the alternative, limit the scope of discovery to the issue of qualified immunity. The district court opted for the latter route, ordering discovery "limited to that which is necessary to address the qualified immunity issue."

The limited scope of discovery prevented Boyd from compelling responses related to his policy and practice allegations. Among these were requests seeking "[a]ll incident reports dealing with excessive use of force and tasers between 2018–2019," Defendant "Armstrong's [personnel] reports and incident[] reports dealing with the use of force in jail," and Defendant "McNamara's reports and incident reports on use of force at the jail and taser reports between 2018–19."

Following this limited discovery, the district court granted summary judgment for Defendants. With respect to Boyd's excessive-force claim, the district court held that "there was no violation of Plaintiff's constitutional rights" because Boyd was "actively resisting" Johnson's attempt to handcuff him when he was tased and because "Johnson's determination that he was threatened was not objectively unreasonable." Turning to Boyd's deliberate indifference claim, the district court held that there was "no summary judgment evidence whatsoever that any Defendant had subjective knowledge of a substantial risk of serious harm to Plaintiff but responded with deliberate indifference to that risk." And as to Boyd's policy and practice

No. 20-50945

claims, the district court held that Boyd failed to meet his burden to present "adequate summary judgment evidence of any official or unofficial policy" depriving him of his federal rights.

Boyd now appeals.

II

In reviewing the district court's summary judgment decision, we must consider the evidence in the record in the light most favorable to Boyd, drawing all reasonable inferences in support of the conclusion that Boyd has raised a jury issue on his claims. *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

Because video evidence is available, we are required to "view the facts in the light depicted by the videotape." *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022) (alteration omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).[2] Inasmuch as that video evidence is inconclusive, however, the ordinary summary judgment standard applies. *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021) ("When video evidence is ambiguous or in fact supports a nonmovant's version of events, or when there is any evidence challenging the video's accuracy or completeness, the modified rule from *Scott* has no application." (citations omitted)).

Applying these standards on a careful review of the available evidence, we conclude that a rational jury could find that Boyd did not pose a threat and was cooperative at the time he was tased. It follows that Boyd's excessive force claim survives summary judgment.

---

[2] We share the dissenting opinion's concern about judicial Monday-morning quarterbacking of difficult, split-second decisions by officers in the field. But Supreme Court precedent rightly requires us to view video evidence when considering an appeal from the grant of summary judgment. *See Scott v. Harris*, 550 U.S. 372, 381 (2007).

A

We begin with what a rational jury could find. Close inspection of the video evidence supports Boyd's contention that he was nonthreatening and compliant throughout his interaction with Johnson. Starting with the question of whether Boyd posed a threat, nothing about Boyd's posture or movements suggest that Boyd was or was about to become dangerous. To the contrary, Boyd stood with his back to Johnson and his hands in the handcuffing position for a full four seconds before Johnson deployed his taser.

Boyd's earlier actions likewise support the conclusion that Boyd was not a security risk. *Cf. Salazar*, 37 F.4th at 282 ("But when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a ploy."). While Boyd initially wrenched his hand away from Johnson in apparent pain from having his injured finger grabbed, at no point does the video show Boyd raising a fist at or approaching Johnson. Instead, after pointing to his injured hand, Boyd quickly turned back around and reassumed the handcuffing position. And while there is no accompanying audio, Johnson has never asserted that Boyd verbally threatened to harm him.

We also note that "this was not a situation where an officer arrived at the scene with little or no information and had to make a split-second decision." *Darden v. City of Fort Worth,* 880 F.3d 722, 732 (5th Cir. 2018). Johnson had been standing next to Boyd when his fractured finger was examined by the jail nurse, so a rational jury could find that Johnson knew why Boyd reacted in pain when his finger was grabbed. Boyd had also just submitted to Johnson's authority in turning over his armband and in following Johnson's instruction to turn around to be handcuffed. Johnson further knew that, as a pretrial detainee, Boyd was highly unlikely to be

concealing a weapon on his person.  A jury viewing this evidence could thus conclude that Johnson had nothing to fear from Boyd.

For much the same reason, a rational jury could conclude that Boyd was not resisting Johnson but was instead pleading with Johnson not to grab his injured hand.  Again, Boyd had been facing away from Johnson with his hands behind his back for four seconds before he was tased, as if inviting Johnson to apply the restraints.  A jury could therefore determine that Boyd is telling the truth when he says that where the video shows him turning his head, he was telling Johnson how to apply the handcuffs without hurting him. In which case, Boyd would have been facilitating rather than hindering Johnson's efforts.

Our task at this early stage is only to determine what a rational jury *could* find.  And in this case, "the district court's view is not the only view a jury could take of the evidence." *Fairchild v. Coryell County*, 40 F.4th 359, 363 (5th Cir. 2022).  Viewing the facts in the light most favorable to Boyd, we conclude that a rational jury could find Boyd credible in his assertion that he did not threaten or resist Johnson.

B

Having determined what a rational jury could find, we now ask whether those findings would legally support a verdict for Boyd.  Because Johnson has asserted qualified immunity, Boyd must show the violation of a constitutional right and that "the 'right at issue was "clearly established" at the time of [the] alleged misconduct.'"  *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

An official violates clearly established law if "then-existing precedent" establishes that the officer's conduct constituted a constitutional violation. *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021).  To provide such

clarity, the precedent must be sufficiently specific: "[i]t is not enough that a rule be suggested by then-existing precedent." *Id.*

Boyd has identified three authorities from this court that are sufficiently specific to put Johnson on notice that his actions, on at least one permissible reading of the evidence, constituted unconstitutionally excessive force.[3]

He points first to *Ramirez v. Martinez*, in which we held that it was a violation of clearly established law to tase the plaintiff even though the plaintiff pulled his arm from the officer's grasp, exchanged profanities with the officer, and questioned the officer's presence at his place of business. 716 F.3d 369 (5th Cir. 2013). The plaintiff alleged that he arrived at his business to find officers with their guns drawn and pointed at his employees. *Id.* at 372. He then approached one of the officers to ask what was happening and, after the two exchanged profanities, the officer told the plaintiff to turn around and put his hands behind his back. *Id.* The plaintiff refused, pulling his arm away from the officer when the officer attempted to grab hold of it. *Id.* The officer immediately tased the plaintiff, who at that point stopped resisting. *Id.* Even so, other officers joined in to help force the plaintiff to the

---

[3] The cases cited by Boyd address claims of excessive force during an arrest brought under the Fourth Amendment's prohibition against unreasonable seizures rather than the Fourteenth Amendment's Due Process Clause. The latter is the locus of the right of a pretrial detainee to be free from excessive force and is therefore the source of the right at issue here. Nevertheless, the standard for excessive force is the same under either provision: "whether the force was objectively unreasonable in light of the 'facts and circumstances of each particular case.'" *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 n.2 (2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). We have previously relied on Fourth Amendment excessive force cases to determine whether a right had been clearly established for purposes of a Fourteenth Amendment excessive force claim. *See Fairchild*, 40 F.4th at 366–67.

ground and onto his stomach, at which point the officer who originally tried to arrest the plaintiff tased him a second time. *Id*. at 373.

We held that the plaintiff's act of "[p]ulling his arm out of [the officer's] grasp, without more, [was] insufficient to find an immediate threat to the safety of the officers." *Id*. at 378. We also held that the defendant officer could not reasonably conclude that the plaintiff posed a threat merely because he exchanged profanities with the officer and questioned the officer's presence at his place of business. *Id*.

Boyd next cites *Hanks v. Rogers*, which held that an officer violates clearly established law when he resorts to a sudden use of force on a plaintiff who is only passively resisting. 853 F.3d 738 (5th Cir. 2017). In that case an officer ordered the plaintiff to drop to his knees, whereupon the plaintiff put his hands behind his back and looked over his shoulder while asking whether he was under arrest. *Id*. at 742. After the officer repeated his instruction several times, the plaintiff—still with his hands behind his back—"made a small lateral step with his left foot." *Id*. The officer then "rushed toward [the plaintiff] and administered a blow to [the plaintiff's] upper back or neck." *Id*. at 743.

We held that this officer "applied clearly excessive and unreasonable force" under clearly established law. *Id*. at 746. In doing so, we stated that an officer applies unconstitutionally excessive force "if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Id*. at 747.

Finally, in *Trammel v. Fruge*, we held that an officer's use of force was excessive under clearly established law despite the plaintiff's failure to follow the officer's instructions. 868 F.3d 332 (5th Cir. 2017). The visibly

intoxicated plaintiff told the officer that he was not going to jail and refused to obey the officer's command to place his arms behind his back. *Id.* at 337. Instead, when the officer grabbed the plaintiff's right arm, the plaintiff "immediately pulled back and told [the officer] that it hurt and not to grab him there." *Id.* Another officer then grabbed the plaintiff's left arm, but the plaintiff "again pulled away." *Id.* The officers then executed a knee strike before tackling the plaintiff to the ground. *Id.*

We held that these actions constituted excessive force and that the officers were not entitled to qualified immunity because "the law at the time of [the plaintiff's] arrest clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Id.* at 343.

These three cases put Johnson on notice that he could not constitutionally fire a taser at a non-threatening, compliant subject. They likewise show that Boyd's act of jerking his hand away from Johnson, yelling in apparent pain, and turning his head did not, standing alone, constitute the kind of threatening behavior or belligerence that justifies the use of force. *See Id.* at 341 ("[W]here an individual's conduct amounts to mere 'passive resistance,' use of force is not justified."); *Ramirez*, 716 F.3d at 378; *Hanks*, 853 F.3d at 747.

Defendants respond by attempting to distinguish these cases from the facts here, relying on the rule that precedent does not clearly establish a right for qualified immunity purposes unless its facts are sufficiently similar to the facts at hand. *Bond*, 142 S. Ct. at 11. With respect to *Ramirez*, Defendants argue that the circumstances of that case did not involve the unique security risks that arise in the prison context. *Hanks* and *Trammel*, they say, suffer

from the same deficiency, but are further distinguishable by the fact that they do not involve the use of a taser.

These distinctions generate no uncertainty about the unconstitutionality of Johnson's actions. We have often explained that "[t]he law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Ramirez*, 716 F.3d at 379 (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)). The touchstone of the inquiry is "fair notice." *Ducksworth v. Landrum*, 62 F.4th 209, 218 (5th Cir. 2023) (Oldham, J., concurring in part and dissenting in part) (citation omitted). *See also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[T]he salient question that the Court of Appeals ought to have asked is whether the state of the law in 1995 gave respondents fair warning that their alleged treatment of Hope was unconstitutional."); *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 471 (5th Cir. 2014) ("What is crucial is that the Defendants had 'fair warning.'"). Distinctions between cases are thus relevant only if they make the applicability of prior precedent unclear.

The distinctions that Defendants identify do not. With respect to the prison context, it is certainly true that we must always consider "the perspective of a jailer who is often forced to make split-second decisions in tense situations." *Fairchild*, 40 F.4th at 363. That is a straightforward application of the general rule to a specific context. But the general rule still applies. In the jail context as in others, "it [is] well-established . . . that officers may not 'use gratuitous force against a prisoner who has already been subdued or incapacitated.'" *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (alterations omitted). *See also Fairchild*, 40 F.4th at 361 ("[T]he jailers' continuing to apply . . . force more than two minutes after [plaintiff] was subdued would violate clearly establish law."); *Aucoin v. Cupil*, 958 F.3d

379, 380 (5th Cir. 2020) ("So when a prison inmate engages in willful misconduct, a prison guard may use reasonable force to restrain him—but after the inmate submits, there is no need, and thus no justification, for the further use of force.").

Here, a jury could rationally conclude that the situation was not tense, and that Johnson had ample time to decide whether it was necessary to use force against Boyd. It could also conclude that there was no threat to prison order that could have justified Johnson's decision to tase Boyd.

Neither are *Hanks* and *Trammel* rendered inapplicable simply because they did not involve the use of a taser. We have previously rejected the argument that prior precedent does not clearly establish law in a taser case simply because that precedent did not involve a taser, explaining that "[l]awfulness of force . . . does not depend on the precise instrument used to apply it," and "[q]ualified immunity will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel." *Newman v. Guedry*, 703 F.3d 757, 763–64 (5th Cir. 2012).

## C

Defendants also assert in a footnote that "it is not clear" whether our precedents, as opposed to the Supreme Court's, can clearly establish the law for purposes of qualified immunity. A proverbial mountain of binding authority is to the contrary.[4] We routinely rely on our own cases to determine

---

[4] *Williams v. City of Yazoo,* 41 F.4th 416, 426 (5th Cir. 2022) (relying on Fifth Circuit precedent for the proposition that "[i]t is clearly established that an official who refuses to treat or ignores the complaints of a detainee violates their rights"); *Crittindon v. LeBlanc*, 37 F.4th 177, 188 (5th Cir. 2022) (relying on Fifth Circuit precedent for the proposition that "it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process"); *Sims v. Griffin*, 35 F.4th 945, 951–952 (5th Cir. 2022) (relying on Fifth Circuit precedent for the proposition that "a prisoner can show his clearly established rights under the Eighth

No. 20-50945

_____

Amendment were violated if a prison official . . . refused to treat [the prisoner], ignored his cries for help, and overall evinced a wanton disregard for [his] serious medical needs"); *Bevill v. Fletcher*, 26 F.4th 270, 280 (5th Cir. 2022) (relying on Fifth Circuit precedent for the proposition that using "government positions to violate Plaintiff's First Amendment rights would be objectively unreasonable in light of clearly established law at the time" (citation omitted)); *Aguirre v. City of San Antonio*, 995 F.3d 395, 416 (5th Cir. 2021) (noting that the court "need not rely" on Supreme Court precedent to conclude that the defendants' actions violated clearly established law because "Plaintiffs' claim that the Officers unconstitutionally employed deadly force in the absence of any threat of death or serious injury to the Officers or the public presents facts very similar to those found in" a Fifth Circuit decision); *Timpa v. Dillard*, 20 F.4th 1020, 1034 (5th Cir. 2021) (relying on Fifth Circuit precedent for the proposition that "the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable"); *Roque v. Harvel*, 993 F.3d 325, 336 (5th Cir. 2021) (relying on Fifth Circuit precedent for the proposition that "by May 2, 2017, the day that [the defendant] shot [the plaintiff], it was clearly established that after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force"); *Dyer v. Houston*, 964 F.3d 374, 384 (5th Cir. 2020) (holding that Fifth Circuit precedent defined "clearly established law in sufficient detail to have notified the Officers that their actions were unconstitutional"); *Amador v. Vasquez*, 961 F.3d 721, 730 (5th Cir. 2020) (relying on Fifth Circuit precedent for the proposition that "[e]very reasonable officer would have understood that using deadly force on a man holding a knife, but standing nearly thirty feet from the deputies, motionless, and with his hands in the air for several seconds, would violate the Fourth Amendment"); *Darden v. City of Fort Worth,* 880 F.3d 722, 733 (5th Cir. 2018) (relying on Fifth Circuit precedent for the proposition that "[t]he law is clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting" and that "at the time of the alleged misconduct it was clearly established that violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force"); *Jauch v. Choctaw County*, 874 F.3d 425, 436 (5th Cir. 2017) (relying on Fifth Circuit precedent for the proposition it is clearly established law that "prolonged detention without the benefit of a court appearance violates the detainee's Fourteenth Amendment right to due process"); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (relying on Fifth Circuit precedent for the proposition that "clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation"); *id*. at 749 (relying on Supreme Court precedent only for the alternative holding that the obvious case exception applies); *Trammell v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017) (relying on Fifth Circuit precedent for the proposition that "the law at the time of [the plaintiff's] arrest clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent,

14

No. 20-50945

whether a rule of law has been clearly established. *See, e.g.*, *Fairchild*, 40 F.4th at 368 ("Within the Fifth Circuit, the law has long been clearly established that an officer's continued use of force on a restrained and subdued subject is objectively unreasonable." (citation omitted)); *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) ("At the time of the incident, it was clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm."); *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016) ("Cooper's right was clearly established. Our caselaw makes certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced."); *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015) ("Our precedent clearly establishes that the Eighth Amendment guarantees inmates a right to

---

not aggressive, and only resisted by pulling his arm away from an officer's grasp"); *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016) (relying on Fifth Circuit precedent in stating "that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who has already been subdued . . . [or] incapacitated'" (omission and alteration in original) (citation omitted)); *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472 (5th Cir. 2014) (relying on Fifth Circuit authority to expand on Supreme Court precedent so as to give the defendants the requisite "fair warning" to clearly establish the right at issue in that case); *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (relying on Fifth Circuit precedent to conclude that the plaintiff's "version of the events violated clearly established law"); *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (relying on Fifth Circuit authorities for the proposition that "[i]t is beyond dispute that [the plaintiff's] right to be free from excessive force during an investigatory stop or arrest was clearly established in August 2007"); *Wernecke v. Garcia*, 591 F.3d 386, 399–400 (5th Cir. 2009) ("As of June 1, 2005, Fifth Circuit precedent clearly established that the Fourth Amendment governs social workers' investigations of allegations of child abuse."); *Lytle v. Bexar County*, 560 F.3d 404, 417–18 (5th Cir. 2009) (relying on Fifth Circuit authorities for the proposition that "[i]t has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others" and that this rule holds "in the more specific context of shooting a suspect fleeing in a motor vehicle").

be free from exposure to extremely dangerous temperatures without adequate remedial measures.").

Finally, we flatly reject counsel's contention at oral argument that we are bound by the district court's determination that no constitutional violation occurred. The fact that "other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear" if this circuit has been clear. *Safford Unif. Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 378 (2009).

In conclusion, we hold that a rational jury could find that Johnson's decision to tase Boyd was not justified by any exigency, in which case Johnson's qualified immunity defense would not shield him from liability because our precedents clearly establish that resort to force in such circumstances is unconstitutional.

III

Boyd also asks that we reverse the district court's grant of summary judgment on his policy and practice claims. The district court denied Boyd's motion to compel discovery relating to his allegation that Defendants instituted and carried out an unconstitutional policy or practice of excessive force. It was inappropriate for the court to then dismiss those claims on the ground that Boyd failed to present "adequate summary judgment evidence of any official or unofficial policy" depriving him of his rights. We therefore reverse the grant of summary judgment and remand on those claims. On remand, the district court should reopen discovery for a reasonable time.

We agree, however, with the district court's conclusion that Boyd failed to present adequate summary judgment evidence of his deliberate-indifference claim, and therefore affirm the dismissal of that claim.

No. 20-50945

\*     \*     \*

If a jury finds, as it could, that Johnson tased a non-threatening, compliant inmate, then he is not entitled to qualified immunity. We therefore REVERSE summary judgment on Boyd's excessive force claim against Johnson and REMAND that claim to the district court for trial. We likewise REVERSE and REMAND the district court's grant of summary judgment on Boyd's policy and practice claims to afford Boyd the opportunity to discover evidence relevant to those claims. But we AFFIRM the dismissal of Boyd's deliberate indifference claim. The motion to dismiss the appeal for lack of jurisdiction is DENIED.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the majority that we should remand Andreas Boyd's policy and practice claims and affirm the dismissal of his deliberate indifference claim. But I respectfully disagree with the majority opinion's analysis of the excessive force claim. As to the latter, I have two principal reservations.

First, the majority opinion relies exclusively on circuit precedent to clearly establish the law. But the Supreme Court has never authorized this approach. *See Nerio v. Evans*, 974 F.3d 571, 576 n.2 (5th Cir. 2020) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 n.8 (2018) ("We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity.")); *see also Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam); *Reichle v. Howards*, 566 U.S. 658, 665 (2012). Absent a clear instruction from our Nation's highest court regarding the relevance of circuit precedent, we cannot expect everyday officers to draw the necessary inferences from our large, ever-growing, and often-contradictory precedents. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that the contours of the right must be "sufficiently clear" so that "*every* reasonable official would have understood that what is doing violates that right" (quotation omitted) (emphasis added)); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (noting that the "focus" of qualified immunity is to provide "fair notice" to officers); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that qualified immunity protects "all but the plainly incompetent or those who *knowingly* violate the law" (emphasis added)). If all circuit precedent is fair game, then how is an officer supposed to choose, in a dangerous split-second moment, which case to follow? *Compare, e.g.*, *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022) (tasing ok, even when the suspect stopped the car, surrendered, and laid on the ground with

his arms above his head and his legs crossed), *and Ramirez v. Escajeda*, 44 F.4th 287 (5th Cir. 2022) (tasing ok, even when the person was unresponsive and hanging from a basketball hoop with a rope around his neck), *with Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013) (tasing not ok when officer told the suspect to put his hands behind his back and the suspect refused and pulled his arm away).

Second, I am increasingly concerned that our excessive-force cases are governed by Justice Stewart's unsatisfying standard of "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). Justice Stewart regretted that statement later in life. *See* Al Kamen, *Retired High Court Justice Potter Stewart Dies at 70*, Wash. Post (Dec. 8, 1985). And that regret is understandable because the statement suggests that constitutional questions hinge on in-chambers video viewings and intuition. But query how our Fourth Amendment approach is different, especially when we combine in-chambers video viewings with the deeply indeterminate corpus of circuit precedent. We certainly have an obligation to watch these videos, *see ante* at 6 n.2; but when we are bound only by conflicting circuit precedent, it is unclear to me if and how we are bound at all.

\*　　\*　　\*

The Supreme Court has told us not to substitute the "20/20 vision of hindsight" for "the perspective of a reasonable officer on the scene," who must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015) (noting that these concerns are particularly important in the prison setting); *Morrow v. Meacham*, 917 F.3d 870, 876 (5th Cir. 2019) ("[T]he law must be *so* clearly established that—in the blink of an eye, in the middle of a high-speed chase— every reasonable officer would know it immediately."). Yet I worry that in-

chambers bodycam movie days, especially when combined with our reliance on circuit precedent, lead to predictably unpredictable interpretations of the "hazy border between excessive and acceptable force." *Brosseau*, 543 U.S. at 201 (quotation omitted)); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007) (noting that there is "no obvious way to quantify" risks to decide whether force is reasonable); *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) ("The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.").

With deepest respect and admiration for my learned and esteemed colleagues, I think it is unwise to give a panel of three judges the power to set clearly established law and thereby bind every law enforcement officer in three States, governing every conceivable emergency situation in every community from El Paso to Pascagoula. And I think it is particularly unwise when the underlying legal standard is so open-ended and our precedents are so contradictory. If the Supreme Court wants to vest this power in us, so be it. But unless and until the Court does, I would not assert it.