# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2022

Lyle W. Cayce
Clerk

No. 21-20544

Jean Henderson; Christopher Devonte Henderson,

*Plaintiffs—Appellants*,

*versus*

Harris County, Texas; Arthur Simon Garduno,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CV-2052

Before Smith, Duncan, and Oldham, *Circuit Judges*.

Per Curiam:

Christopher Henderson fled from three officers investigating drug activity. An officer chased Henderson and commanded him to stop. Eventually, Henderson stopped and turned suddenly toward the officer. The officer feared Henderson was reaching for a weapon, so he tased him. Henderson sued Harris County and the officer. The district court dismissed the *Monell* claim against Harris County for failure to state a claim and granted summary judgment to the officer based on qualified immunity. We affirm.

No. 21-20544

I.

A.

On April 26, 2018, three police officers went to Houston's Ingrando Park to investigate drug activity. One of the officers was Arthur Garduno, a deputy constable for Harris County Constable Precinct 6. The officers approached the park separately in marked patrol cars and saw three men at a picnic table. Garduno claims he smelled marijuana and saw one of the men "breaking up marijuana" into a shoebox. Another one of the men was Christopher Henderson. Garduno claims Henderson had a blunt tucked behind his ear and that Henderson threw a plastic bag containing a leafy green substance onto the ground.

When Henderson saw the officers, he ran. Garduno radioed about a person evading arrest, activated his siren, and followed. As Henderson entered an apartment complex, Garduno jumped out of the car and continued the chase on foot. Eventually, Garduno caught up to Henderson in the complex parking lot and ordered Henderson to stop running.[1] Garduno warned, "I'm going to tase you." What happened next is disputed. Garduno says Henderson stopped, turned to face him, and reached toward his waistband with both hands. Henderson claims he stopped running, "turned his head slightly toward the deputy, and raised his hands in the air as if to surrender."

Garduno feared Henderson was reaching for a weapon, so Garduno deployed his taser. But because only one of the taser's prongs reached Henderson—one lodged in his face, and the other went over his head—the

---

[1] The parties dispute how many times Garduno told Henderson to stop. Henderson says he heard Garduno yell "stop" only once. Garduno and several witnesses recall multiple commands.

circuit didn't complete, and the taser didn't shock Henderson. So one second later, Garduno deployed his taser a second time. This time both prongs lodged in Henderson's back. He fell backward and hit his head.

The other officers arrived at the scene. Garduno claims Henderson continued to struggle while on the ground and resisted being placed in handcuffs. So Garduno "dry" tased him a final time.

The officers searched Henderson and found marijuana in his pocket but no weapon. Henderson was charged with possession of marijuana of less than 2 oz. in a drug-free zone, but that charge was later dismissed on the prosecution's motion.

## B.

Christopher Henderson and his grandmother Jean Henderson sued Deputy Garduno and Harris County under 42 U.S.C. § 1983 for violations of Henderson's Fourth Amendment rights, as incorporated. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).[2] The district court dismissed the claim against the County and granted summary judgment to Garduno. Henderson timely appealed.

As to the *Monnell* claim, Henderson alleged the County failed "to adopt any policies whatsoever to govern Deputy Garduno's use of force," "failed to train Deputy Garduno in the proper use of a [t]aser," and "failed to supervise Deputy Garduno." Henderson further alleged the "chief policymaker was the Constable of Precinct 6, Silvia R. Trevino," or "in the

---

[2] Jean Henderson is plaintiff-appellant here. Chris and Jean were both named plaintiffs when the suit was filed. But earlier in the litigation, Chris became unable to act for himself, so Jean obtained a guardianship over Chris's person and estate. Jean is now the sole plaintiff on behalf of Chris both as next friend and as the guardian of his person and estate.

alternative, the chief policymaker was another person with managerial authority."

The County moved to dismiss under Rule 12(b)(6). The district court granted the motion. It held Henderson (1) failed to allege an "official policy" to state a plausible § 1983 claim against Harris County and (2) failed to allege a pattern of constitutional violations sufficient to show deliberate indifference or establish deliberate indifference through the single-incident exception to failure-to-train liability.

Afterward, Henderson moved to alter or amend the judgment under Rule 59(e), asking the court to either allow her to amend her complaint based on additional evidence contained in her summary-judgment filings, or reconsider its dismissal order based on the court's alleged mischaracterization of the facts and Henderson's ability to plead a *Monell* cause of action. The district court declined, holding: (1) Henderson was not entitled to leave to amend because she did not seek such leave during the fourteen months Harris County's motion to dismiss was pending, nor did she allege any facts unavailable to her during those fourteen months; (2) Henderson was not entitled to reconsideration based on the court's allegedly "misleading" summary of the facts because "[e]ven assuming that the [c]ourt's brief recitation of the facts was inaccurate, which the [c]ourt disputes, such characterization would not alter the outcome of the [m]otion to [d]ismiss."

As to the claim against Officer Garduno, Henderson alleged Garduno's conduct violated the Fourth Amendment and was objectively unreasonable under clearly established law. Garduno moved for summary judgment, asserting qualified immunity. The district court held that Henderson alleged facts sufficient to establish a Fourth Amendment violation but failed at the second step of the qualified-immunity analysis

because Garduno's "conduct was not objectively unreasonable in light of clearly established law at the time the violation occurred." Accordingly, the district court granted summary judgment for Garduno, finding he was entitled to qualified immunity.

We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* both the district court's grant of Garduno's summary judgment motion based on qualified immunity, *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016), and its grant of the County's motion to dismiss for failure to state a *Monell* claim, *Groden v. City of Dallas*, 826 F.3d 280, 283 (5th Cir. 2016). We review the district court's denial of Henderson's Rule 59(e) motion to alter or amend the judgment for abuse of discretion. *Trevino v. City of Fort Worth*, 944 F.3d 567, 570 (5th Cir. 2019).

## II.

First, the *Monell* claim. Henderson argues the district court erred because (A) Harris County failed to provide *any* use-of-force policies or train its officers on taser use,[3] and (B) the district court employed an unfair procedure by dismissing her claims *sua sponte*. Both arguments fail.

## A.

To establish *Monell* liability, a plaintiff must show that an official policy promulgated by a municipal policymaker was the moving force behind the violation of a constitutional right. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). And to get past the pleading stage, a complaint's

---

[3] Henderson also asserted that Harris County "failed to supervise Deputy Garduno." But as Henderson conceded—and as the district court correctly noted—this claim relies entirely "on Harris County's [alleged] failure to formulate an adequate policy concerning [t]aser usage." Thus, we follow the district court's lead in treating Henderson's supervisory liability claim as encompassed in her other claims.

"description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quotation omitted). A "failure-to-train action is a type of *Monell* claim." *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021). To establish *Monell* liability on a failure-to-train theory, a plaintiff must prove that: "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Ibid.* Henderson must plausibly allege each element, but she flunks all three.

First, Henderson has not plausibly alleged that the County failed to train the officers involved on the constitutional use of tasers. Henderson contends Harris County was placing officers on the street *without any training* as to when they may constitutionally use a taser. Her only support for that contention: The County—in response to public information requests by Henderson's attorney—"failed to produce any written policies or procedures governing the conduct of deputy constables in performing law enforcement." The district court rightly rejected these allegations as "conclusory," holding that the complaint contained "no 'specific facts' as to whether Trevino or Harris County had a 'custom or practice' of not creating or implementing policies governing Precinct 6 deputies." This alone is enough to dispose of Henderson's failure-to-train claim. And Henderson's broader claim that the County failed to implement any use-of-force policies is deficient for the same reason.

Second, Henderson has not plausibly alleged a causal connection between any failure to train officers and the alleged violation here. That is because it was Deputy Garduno who allegedly violated the Constitution by deploying his taser. Indeed, Henderson herself "conceded that Garduno

received [t]aser training from TCOLE," the Texas Commission on Law Enforcement. She attempts to get around that concession by arguing there is a difference between training officers in "the mechanics of using a taser weapon" and in "the constitutional limitations of the use of force with a taser weapon." But she supplies no reason to think the TCOLE program trained officers in the former and not the latter.

Third, Henderson has not plausibly alleged that any failure to train constituted deliberate indifference. "To show deliberate indifference, a plaintiff normally must allege 'a pattern of similar constitutional violations by untrained employees.'" *Hutcheson*, 994 F.3d at 482 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). If a plaintiff cannot allege a pattern, "it is still possible to establish deliberate indifference through the single-incident exception." *Id.* But that exception is "extremely narrow." *Id.* (citation omitted). Indeed, "[t]he single-incident exception 'is generally reserved for those cases in which the government actor was provided *no training whatsoever*.'" *Id.* at 483 (emphasis added) (quoting *Peña*, 879 F.3d at 624). And it requires proving "that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Id.* at 482 (quoting *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010)). "For a violation to be 'highly predictable,' the municipality 'must have failed to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'" *Id.* at 483 (quoting *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624–25 (5th Cir. 2018)).

Here, Henderson concedes that she does "not allege a pattern of similar constitutional violations" and instead "contend[s] that [her] claim falls within the single-incident exception." *Id.* There are at least two problems with that. First, as already noted, this is not a case where "the government actor was provided no training whatsoever," *id.* (quotation omitted), because everyone agrees Garduno was trained in proper taser use.

No. 21-20544

Second, Henderson again relies *only* on the County's "failure to produce certain policies and procedures" in response to public information requests. She suggests the only possible conclusion to be drawn from the County's failure to respond to those requests is that the County had *no* policies and offered its officers *no* training on proper taser use. As the district court rightly concluded, these "vague allegations are insufficient to establish 'deliberate indifference' through the single-incident exception."

## B.

Henderson also contends the district court erred by dismissing the *Monell* claim against Harris County *sua sponte*. But the district court did not dismiss *sua sponte*; it acted on the County's motion to dismiss. Henderson claims she "was truly blindsided by the [d]istrict [c]ourt's decision to dismiss Harris County." But she concedes in the very same sentence that Harris County's motion to dismiss was pending for fourteen months. She even responded to that motion, making the same arguments she now advances on appeal. The district court's order granting dismissal closely tracked the arguments in the County's motion and rejected the arguments in Henderson's response. Thus, Henderson could not have been blindsided by anything in the district court's order, and the district court was well within its discretion to deny Henderson's Rule 59(e) motion.

## III.

Next, Henderson's claims against Officer Garduno. To prevail, Henderson must overcome Garduno's qualified immunity defense, which "includes two inquiries. The first question is whether the officer violated a constitutional right. The second question is whether the right at issue was clearly established at the time of the alleged misconduct." *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (quotation omitted). "We can decide one question or both." *Ibid.* Here, we only answer the second.

8

To show clearly established law, Henderson has two paths: (A) she can identify an on-point case, or (B) she can satisfy the obvious-case exception. *See Salazar v. Molina*, 37 F.4th 278, 285–86 (5th Cir. 2022). Henderson does neither.

### A.

Start with on-point cases. Qualified immunity generally relieves law enforcement officers of the burden of defending personal-capacity suits. The immunity, however, does not protect officers who violate clearly established constitutional rights. Rights are "clearly established" when "existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15 (2015) (per curiam)), *not* when a rule is merely "suggested by then-existing precedent," *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam). The Supreme Court recently underscored the importance of specificity in the clearly-established-law inquiry when it reminded lower courts "not to define clearly established law at too high a level of generality." *Id.* Rather, courts must determine that existing precedent has rendered the right "beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).

The hurdle is even higher when the plaintiff alleges a Fourth Amendment violation. As we have said elsewhere, in excessive-force cases requiring split-second judgments, it is "especially difficult" to overcome qualified immunity. *Morrow*, 917 F.3d at 875. That is because in the Fourth Amendment excessive-force context, "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (quotation omitted); *see Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (laying out the excessive-force inquiry, which "requires careful attention to the facts and

No. 21-20544

circumstances of each particular case"). Thus, Henderson must demonstrate that the law is "*so* clearly established that—in the blink of an eye, in the middle of a high-speed chase—every reasonable officer would know it immediately." *Morrow*, 917 F.3d at 875.

Henderson points to a slew of cases. But many of the cases she relies on are irrelevant to the clearly-established-law inquiry—either because they issued too late or because they do not bind us (and hence do not give officers in our circuit fair notice of the law). And the cases she cites that *could* clearly establish law do not do so with the requisite specificity.

First, several of Henderson's cases came too late to supply clearly established law. Garduno tased Henderson on April 26, 2018. Any cases after that date "cannot show clearly established law at the time of the violation." *Salazar*, 37 F.4th at 286 (quotation omitted); *see also Kisela*, 138 S. Ct. at 1154 ("[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious."). That rule dispatches the bulk of Henderson's cases.[4] *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020); *Amador v. Vasquez*, 961 F.3d 721, 730 (5th Cir. 2020); *Timpa v. Dillard*, 20 F.4th 1020, 1035 (5th Cir. 2021); *Cole v. Carson*, 935 F.3d 444, 449, 456–57

---

[4] To this, Henderson argues that "[p]ost-incident cases which merely apply clearly established law from pre-incident authority are instructive and provide valuable guidance in determining whether the law was clearly established with sufficient clarity at the time of the incident." Specifically, Henderson says that she never contends any of the post-incident cases she cites *established* new law; rather, these cases are meant to demonstrate "how the legal principles clearly established in [cases like] *Newman*, *Trammel*, *Stain*, *Hanks*, *Cooper*, and *Goodson* . . . have been applied." We reject Henderson's attempt to bootstrap after-the-fact precedent. The law must be "'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If Henderson must rely on post-incident cases to prove clearly established law, then the law was not clearly established at the time of the incident. A pig with lipstick is still a pig.

(5th Cir. 2019) (en banc); *Scott v. White*, 810 F. App'x 297, 301–02 (5th Cir. 2020); *Fairchild v. Coryell Cty.*, 40 F.4th 359, 362–67 (5th Cir. 2022).

Second, various other cases Henderson cites are unpublished. But unpublished opinions "do not establish any binding law for the circuit," so "they cannot be the source of clearly established law for the qualified immunity analysis." *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (quotation omitted); *see also Salazar*, 37 F.4th at 286 (same); *Bell v. City of Southfield*, 37 F.4th 362, 367–68 (Thapar, J.) ("[A] plaintiff cannot point to unpublished decisions to . . . [demonstrate] a right has been clearly established."). This rule eliminates several more of Henderson's authorities. *See Peña v. City of Rio Grande*, 816 F. App'x 966, 974–77 (5th Cir. 2020) (per curiam); *Autin v. City of Bayton*, 174 F. App'x 183, 186 (5th Cir. 2005) (per curiam); *Massey v. Wharton*, 477 F. App'x 256 (5th Cir. 2012) (per curiam).

Finally, Henderson also invokes a handful of published Fifth Circuit opinions.[5] Most of Henderson's remaining cases "do not involve tasing or fleeing," *Salazar*, F.4th at 286, so she relies on them for general statements of law. *See Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (denying QI to officer who "forcefully slam[med arrestee's] face into a vehicle while she was restrained and subdued"); *Cooper v. Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016) (denying QI to officer who subjected arrestee "to a lengthy dog attack" even though he "was not actively resisting arrest or attempting to flee"); *Lytle v. Bexar Cnty.*, 560 F.3d 404, 412–13 (5th Cir. 2009) (denying QI to officer who "fir[ed] at the back of a fleeing vehicle some distance away"); *Trammell v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017) (denying QI where

---

[5] "Even on the assumption that Fifth Circuit precedent can create clearly established law . . . none of [Henderson]'s cases is a close enough fit." *Salazar*, 37 F.4th at 286 (citing *Rivas-Villegas*, 142 S. Ct. at 7 (assuming without deciding that "controlling Circuit precedent clearly establishes law for purposes of § 1983")).

several officers tackled an individual who was not fleeing and who did not pose danger to himself or others); *Hanks v. Rogers*, 853 F.3d 738, 745–46 (5th Cir. 2017) (denying QI to officer who employed a "half spear takedown" on suspect who was not actively resisting and "made no attempt to flee"); *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000) (denying QI to officers who, without reasonable suspicion, tackled an individual who was not fleeing, not violent, and who resisted only by pulling his arm away from the officer). But such general statements are insufficient to produce "clearly established" law. *See Kisela*, 138 S. Ct. at 1153 ("[P]olice officers are entitled to qualified immunity unless existing precedent *squarely governs* the *specific facts* at issue." (emphasis added) (quotation omitted)).

That leaves only two published Fifth Circuit cases involving tasings: *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), and *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018). These cases are cited by every tasing plaintiff who sues under § 1983 in our circuit. But these cases are extreme examples that do nothing to clearly establish the law for less-extreme tasings like Henderson's.

Start with *Newman*. In that case, Derrick Newman was a passenger in a vehicle that was pulled over for failing to yield. An officer discovered an outstanding warrant for a different passenger and began to arrest him. Newman got out of the car and consented to a protective pat-down search. In his telling, Newman complied with all commands, but after he made an off-color joke, the officers beat him with a baton and tased him three times. This court denied the officer qualified immunity. *See Newman*, 703 F.3d at 759 (concluding none of the *Graham* factors justified the tasing because "on Newman's account, he committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command"). "Because *Newman* involved a plaintiff who committed no crime and obeyed all commands, that case cannot clearly establish that using a taser was

unlawful in the circumstances [Garduno] confronted here." *Salazar*, 37 F.4th at 288.

Henderson's reliance on *Darden* fares no better. While executing a no-knock warrant at a private residence, officers "allegedly threw [Darden] to the ground, tased him twice, choked him, punched and kicked him in the face, pushed him into a face-down position, pressed his face into the ground, and pulled his hands behind his back to handcuff him," ultimately causing him to suffer a heart attack and die during the arrest. *Darden*, 880 F.3d at 725. "The force used in *Darden*—causing the death of the arrestee—is obviously much more extreme than the . . . tasing at issue here." *Salazar*, 37 F.4th at 288.

In short, *Newman* and *Darden* are nothing like this case. Both involved "far more force than was deployed here." *Id.* at 287. And neither involved a suspect fleeing from police. Even on Henderson's own version of the facts, this case is radically different: Henderson concededly ran from police, then stopped suddenly and turned toward the pursuing officer. Thus, neither *Newman* nor *Darden* involves materially similar facts and hence cannot clearly establish the law.

B.

Finally, the obvious-case exception. Henderson cites *Hope v. Pelzer* and *Taylor v. Riojas* for the proposition that there can be "notable factual distinctions between the precedents relied on . . . so long as the prior decision gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quotation omitted); *see Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (similar). *Hope* and *Taylor* are Eighth Amendment cases that predated *City of Tahlequah*. So it is unclear how much if any weight we should place on obvious *Eighth* Amendment cases in the face of Supreme Court direction in *Fourth*

Amendment cases "not to define clearly established law at too high a level of generality." *City of Tahlequah*, 142 S. Ct. at 11. And even if *Hope* and *Taylor* could apply here, "obvious" cases are exceedingly "rare." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *see Bartlett*, 981 F.3d at 337 ("The standard for obviousness is sky high.").

Even accepting Henderson's versions of the facts, this case is not obvious. Garduno made the split-second decision to deploy his taser after Henderson had led him on a long chase by car and by foot and was still unrestrained. Henderson admits he suddenly stopped running, turned toward Garduno, and moved his arms in a manner that suggested to Garduno that Henderson was reaching for a weapon. This is a far cry from the handful of instances where we have recognized an "obvious case." If anything, the obviousness of this case points in the other direction: As illustrated in *Escobar v. Montee*, 895 F.3d 387 (5th Cir. 2018), and as we explained in *Salazar*, "a suspect cannot refuse to surrender and instead lead police on a dangerous hot pursuit—and then turn around, appear to surrender, and receive the same Fourth Amendment protection from intermediate force he would have received had he promptly surrendered in the first place." *Salazar*, 37 F.4th at 282–83.

AFFIRMED.