# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2025

Lyle W. Cayce
Clerk

No. 24-40155

———————

Jacqueline Louise Stapleton; Dawn Stapleton, *as Personal Representative of* the Estate of Joshua Stapleton,

*Plaintiffs—Appellees*,

*versus*

Ernesto Lozano; Justin Lee Becerra; Cesar Solis,

*Defendants—Appellants*.

———————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:23-CV-69

———————

Before Richman, Graves, and Ramirez, *Circuit Judges*.
Irma Carrillo Ramirez, *Circuit Judge*:

While he was being booked into jail for public intoxication, Joshua Stapleton told police officers that he did not feel well. A few hours later, he died from "combined drug toxicity." Stapleton's family sued the officers and the police chief under 42 U.S.C. § 1983, alleging deliberate indifference to Stapleton's serious medical needs while he was in jail. The officers and the police chief moved to dismiss the lawsuit based on qualified immunity, and the district court denied their motion. We REVERSE.

No. 24-40155

I

A

Around 5:40 p.m. on February 26, 2021, Progreso Police Officer Ernesto Lozano stopped a car he observed swerving in and out of the center lane. He approached the vehicle and asked the driver, Joshua Stapleton, for his driver's license. Noting Stapleton's bloodshot eyes and slurred speech, Officer Lozano asked him to exit the car for a field sobriety test. Stapleton complied and failed the test.

Officer Lozano arrested Stapleton and Michael Guerrero, the car's sole passenger, for public intoxication. Chief of Police Cesar Solis arrived to assist with the arrest. Officer Lozano then searched Stapleton's car and found four hydrocodone bitartrate pills, two diazepam pills, one acetaminophen and hydrocodone pill, and two gabapentin capsules. He also found a clear package labeled "hemp" and two burnt pipes.

Around 6:30 p.m., Officer Lozano booked Stapleton and Guerrero into jail. During booking, Stapleton told Officer Lozano that he "was not feeling well." He was "visibly swaying and slightly unsteady on his feet," and he had a dark substance on the fingertips of both of his hands. Stapleton did not request or receive medical attention. Officer Lozano placed both men in a holding cell monitored by closed-circuit television cameras ("CCTVs"). Video from the cameras shows that Officer Lozano came to the holding cell several times to speak to both men and give them hand sanitizer.

Video also shows that Officer Justin Lee Becerra came to the holding cell and took Stapleton's temperature around 8:20 p.m. Stapleton was still "swaying and generally unsteady on his feet." After his temperature was taken, Stapleton knelt on the floor, leaned forward slowly over his folded legs, and began rocking back and forth. About ten minutes later, Guerrero took off his shirt and draped it around Stapleton's shoulders. Guerrero then walked

back and forth along the perimeter of the holding cell, leaning outside of the bars to speak to the women in the adjacent cell. Stapleton remained in the same position for the next hour. Both officers walked past him several times, but neither spoke to him.

Around 9:30 p.m., Guerrero attempted to rouse Stapleton. He tried to pick Stapleton up by his arms, but Stapleton could not stand. The women in the adjacent holding cell began screaming for help, and about two minutes later, Officer Lozano ran to the holding cell and called for help on his shoulder-mounted radio. Around 9:55 p.m., Officer Lozano and a first responder entered the holding cell. Officer Becerra and several other first responders followed and began attempting chest compressions. Officer Becerra administered Narcan while Chief Solis appeared to be talking on his cell phone.

Doctors at Knapp Medical Center in Weslaco, Texas, where Stapleton was taken, determined that he had experienced cardiac failure, circulatory failure, and central nervous system failure. Stapleton died between 10:44 p.m. and 10:53 p.m. from what was later determined to be "combined drug toxicity." According to a toxicology report, he had alcohol, fentanyl, Narcan, clonazepam, alprazolam, dihydrocodeine, hydrocodol, norfentanyl, and mitragynine in his system at the time of his death.

Within a half hour of Stapleton's death, the Hidalgo County Sheriff's Office opened an investigation. During his interview, Officer Lozano explained that "once a subject is booked in, he – and presumably other Progreso PD officers – then go to a room outside of the area of the cells to draft their reports." An officer had to leave the station to respond to calls that came in. No one in the police department supervised the inmates if the officer left, but "[m]aybe the fire department's looking at 'em" on CCTV. "[The

fire department is] usually there. They have a TV in their kitchen with cameras."

Officer Lozano stated that, after he placed Stapleton in the holding cell, he left the police station to assist Chief Solis with another traffic stop. Officer Lozano returned to the department to work on his report in a room where he could "kinda" monitor the inmates. He realized that Stapleton was in medical distress when he heard the three women in the adjoining holding cell screaming for help.

## B

Stapleton's mother and sister sued Officer Lozano, Officer Becerra, Chief Solis, and the City of Progreso under 42 U.S.C. § 1983, alleging deliberate indifference to Stapleton's serious medical needs while he was in custody.

The officers and chief moved to dismiss the complaint, arguing that the Stapletons had not pleaded sufficient facts to overcome their qualified immunity. They argued that the Stapletons had not sufficiently alleged that the officers and chief were deliberately indifferent to a substantial risk of serious harm or that their conduct violated clearly established law. The district court denied their motion. This appeal followed.

## II

The denial of a motion to dismiss asserting qualified immunity is an immediately appealable decision under the collateral order doctrine. *See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).

We review this denial *de novo. Ramirez v. Escajeda*, 921 F.3d 497, 500 (5th Cir. 2019) (citing *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)). At this early stage, review is "restricted to determining whether the facts

4

pleaded establish a violation of clearly-established law." *Stevenson v. Tocé*, 113 F.4th 494, 501 (5th Cir. 2024) (internal quotations marks omitted) (quoting *Ramirez*, 921 F.3d at 501). We must assume the "veracity of well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief." *Ramirez*, 921 F.3d at 501 (internal quotations marks omitted) (quoting *Ashcroft*, 556 U.S. at 679). All well-pleaded facts are viewed in the light most favorable to the plaintiff. *Fisher v. Moore*, 73 F.4th 367, 371 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024).

## III

The defense of qualified immunity protects state officials from civil suit when they could have reasonably believed that their actions were legal. *McKay v. LaCroix*, 117 F.4th 741, 746 (5th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021) (internal quotation marks omitted) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)).

A state official is entitled to qualified immunity unless (1) the plaintiff alleged a violation of a constitutional right; and (2) that right was "clearly established" at the time of the alleged violation. *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (citing *Pearson*, 555 U.S. at 232). While a court has sound discretion to address either of these prongs first, "the development of the law is best served by undertaking, wherever possible, the threshold constitutional analysis." *Mayfield v. Currie*, 976 F.3d 482, 493 (5th Cir. 2020) (Willett, J., concurring); *Cope*, 3 F.4th at 204 ("Still, often 'the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a

constitutional right at all.'"") (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

A

Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a constitutional right "not to have their serious medical needs met with deliberate indifference." *Kelson*, 1 F.4th at 417 (5th Cir. 2021) (internal quotation marks omitted) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001)). "[A] serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)). To succeed on a deliberate-indifference claim, the plaintiff must show that the officer: "(1) subjectively knew of a substantial risk of serious harm to the detainee; and (2) responded to that risk with 'deliberate indifference.'" *Ford v. Anderson Cnty.*, 102 F.4th 292, 307 (5th Cir. 2024) (quoting *Cope*, 3 F.4th at 206–07). The plaintiff must also demonstrate that "substantial harm" resulted from that conduct. *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020).

Deliberate indifference is an extremely high standard to meet. *Kelson*, 1 F.4th at 417 (quoting *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020)). It "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459 (citing *Hare v. City of Corinth*, 74 F.3d 633, 645, 649 (5th Cir. 1996)). "Rather, the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752,

756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). When multiple officials are named as defendants, each officer's knowledge and response is evaluated individually, to the extent possible. *Williams v. City of Yazoo*, 41 F.4th 416, 423 (5th Cir. 2022); *Cope*, 3 F.4th at 207 (5th Cir. 2021) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).

1

Regarding Officer Lozano, the Stapletons allege that he conducted the traffic stop. At the time he booked Stapleton into jail, Stapleton was "clearly and visibly swaying and slightly unsteady on his feet" and "not feeling well," but Officer Lozano left him unsupervised for some time. The Stapletons argue that these allegations are enough to defeat qualified immunity: "Officer Lozano possessed additional knowledge about the risk of overdose because he inventoried the drugs found in Stapleton's car."

An officer's failure to immediately recognize ambiguous symptoms as a medical emergency does not amount to deliberate indifference, although it might constitute negligence. For example, in *Tamez v. Manthey*, 589 F.3d 764, 771 (5th Cir. 2009), we found that the facts pleaded did not suggest a "need for immediate attention" "[b]ecause pupil dilation can mean 'a lot of things,' . . . and because the undisputed evidence is that medical clearances were requested for even the most minor medical issues." *See Trevino v. Hinz*, 751 Fed. App'x. 551, 555 (5th Cir. 2018) (the plaintiffs' "allegations may depict negligence on the officers' part in not initially realizing the gravity of Trevino's condition and in not calling an ambulance sooner. But negligent or even grossly negligent conduct does not rise to the level of deliberate indifference."); *Estate of Allison v. Wansley*, 524 F. App'x 963, 972 (5th Cir. 2013) (holding that the appellees did not plead facts showing deliberate

indifference because "Appellees have presented no evidence to indicate that Decedent Allison's physical condition exceeded anything beyond perhaps significant intoxication."); *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (finding that the plaintiffs' allegations that paramedics should have provided additional care after treating Graham were "[a]t most, . . . allegations that the Paramedics acted with negligence").

Here, Stapleton's symptoms were initially ambiguous. His eyes were bloodshot, his speech was slurred, and he was "visibly swaying and slightly unsteady on his feet" when he arrived at the jail. Stapleton later knelt on the floor, leaned over his folded legs, and began rocking back and forth. This behavior did not suggest a "need for immediate medical attention." *Tamez*, 589 F.3d at 771. Even Guerrero, who was in the same holding cell, remained unaware of Stapleton's condition for about an hour until he tried to pick Stapleton up by his arms and realized that he could not stand.

Moreover, although Stapleton told Officer Lozano that he "did not feel well," the video does not reflect any request for medical assistance. The Stapletons made no allegation that Officer Lozano refused to treat Stapleton, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for his serious medical needs. *Domino*, 239 F.3d at 756. The complaint alleges that Officer Lozano came to the holding cell multiple times to speak to Stapleton and Guerrero. He also responded quickly after the women in the adjacent holding cell began screaming for help.

Even taking all facts in the light most favorable to the Stapletons, the facts alleged do not rise to level of "wanton disregard" and deliberate indifference to Stapleton's serious medical needs. The Stapletons did not sufficiently allege a deliberate-indifference claim against Officer Lozano.

No. 24-40155

2

Officer Becerra is mentioned just three times in the complaint. The Stapletons allege that he: (1) took Stapleton's temperature; (2) escorted other detainees to an adjacent holding cell; and (3) entered Stapleton's cell and administered Narcan. They claim these allegations are sufficient to defeat qualified immunity because it was reasonable to infer that Officer Lozano told him about the drugs found in Stapleton's car; "[b]oth Officer Becerra and Officer Lozano were on-site and apparently responsible for inmate well-being," and "[b]oth Officer Becerra and Officer Lozano could have seen that Stapleton was in medical distress and deteriorating." Relying on *Huff v. Refugio Cnty. Sheriff's Dep't*, No. 6:13-CV-00032, 2013 WL 5574901 (S.D. Tex. Oct. 9, 2013), the Stapletons argue that they do not need to specifically allege in their complaint what Officer Becerra did—or did not do—that amounted to deliberate indifference.

In *Huff*, the plaintiff alleged that two corrections officers repeatedly slammed him into the holding cell's cement floor and walls. 2013 WL 5574901, at *1. The officers moved to dismiss the claim against them because he "ha[d] not specified which of the two jailers violently and repeatedly slammed Plaintiff into the cement wall and which one jerked his arm behind his back." *Id.* at *2 (internal quotation marks omitted). The district court denied the motion to dismiss because the plaintiff alleged that both officers used excessive force and that "both [officers] were present in the cell when the force was applied." *Id.* at *3.

The plaintiff in *Huff* sufficiently pleaded an excessive force claim against the officers because he alleged an injury resulting from both officers' "*direct* involvement in applying excessive force." *Id.* (emphasis added). Here, the Stapletons have only alleged that Officer Becerra was on site and

9

could have seen that Stapleton was in medical distress. They have not alleged facts showing that Officer Becerra knew of a substantial risk of serious harm to Stapleton, or that he acted with deliberate indifference, an essential element of their claim against him.[1] Deliberate indifference is, as discussed, an extremely high standard to meet. *Kelson*, 1 F.4th at 417. The Stapletons must allege facts indicating a "wanton disregard" for serious medical needs because deliberate indifference cannot be inferred from a negligent—or even a grossly negligent—response to a substantial risk of serious harm. *Domino*, 239 F.3d at 756.

Even taking all facts in the light most favorable to them, the Stapletons did not sufficiently allege a deliberate-indifference claim against Officer Becerra.

3

As for Chief Solis, the Stapletons allege that he (1) assisted Officer Lozano in conducting Stapleton's traffic stop; (2) called Officer Lozano for assistance in a subsequent traffic stop; and (3) approached Stapleton's holding cell and used his cell phone while Stapleton was in medical distress. They argue that these allegations are sufficient to defeat qualified immunity because it is reasonable to infer that Chief Solis knew about the opioids in Stapleton's car; he was present during part of the traffic stop and knew there was a risk that Stapleton was suffering from drug intoxication. The Stapletons argue that, based on these alleged facts, "[a]ny reasonable officer would have known that further monitoring was required under the

---

[1] In fact, the complaint alleges that Officer Becerra responded quickly to Stapleton's medical distress, administering Narcan as firefighters and paramedics attempted chest compressions.

circumstances." They also point to *Nagle v. Gusman*, 61 F. Supp. 3d 609 (E.D. La. 2014).

In *Nagle*, the plaintiff was held under suicide watch, but the officer assigned to maintain direct and constant observation of him abandoned his post three times, and the plaintiff committed suicide. 61 F. Supp. 3d at 617. His siblings sued the police officer under 42 U.S.C. § 1983, and the district court determined that the officer had actual knowledge of a serious risk because he was assigned to monitor the plaintiff on suicide watch. *Id.* at 629. Here, the Stapletons allege no facts showing that Chief Solis knew that there was a substantial risk of serious harm. They only alleged that Chief Solis knew that Stapleton had been arrested, drugs were found in his vehicle, and Stapleton was "clearly and visibly swaying and slightly unsteady on his feet." But these symptoms can "mean a lot of things," and they are typical symptoms of alcohol intoxication. *Tamez*, 589 F.3d at 771 (internal quotation marks omitted). The Stapletons must allege facts indicating a "wanton disregard" for serious medical needs, but nothing about the facts in this case suggested a need for immediate attention or further monitoring. *Domino*, 239 F.3d at 756. The facts alleged do not meet the "extremely high standard" of deliberate indifference. *Kelson*, 1 F.4th at 417.

Even taking all facts in the light most favorable to the Stapletons, the facts they allege do not reflect that Chief Solis acted with deliberate indifference to Stapleton's serious medical needs.

B

The Stapletons' failure to allege a constitutional violation—the first prong of the qualified immunity analysis—forecloses their ability to succeed on their deliberate-indifference claims against the officers. Even though this alone is enough to reverse the district court's holding, we also assess whether

the constitutional right at issue was "clearly established" at the time of the alleged violation.

To demonstrate that the constitutional right at issue was "clearly established," the plaintiff "must show that the law was 'sufficiently clear' at that time 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). This "demanding" standard "requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Wesby*, 583 U.S. at 63 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).[2]

The Stapletons attempted to meet this burden in pointing to cases establishing that pretrial detainees have a Fourteenth Amendment right to

---

[2] The plaintiff can also meet this requirement by arguing that analogous case law is not needed because the unlawfulness of the challenged conduct is clear. *Tyson v. Sabine*, 42 F.4th 508, 520 (5th Cir. 2022) ("[Qualified immunity] does not immunize those officials who commit novel, but patently 'obvious,' violations of the Constitution."). This standard requires "particularly egregious" facts and "extreme circumstances." *Id.* ("We have little trouble finding that the constitutional offense was obvious because the physical sexual abuse alleged here is … by a state official."). *See, e.g., Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (per curiam) (holding that qualified immunity should not be granted where petitioner was confined in a cell "covered, nearly floor to ceiling, in massive amounts of feces: all over the floor, the ceiling, the window, the walls, and even packed inside the water faucet") (internal quotation marks omitted). The Stapletons have not alleged that their case meets this level of obviousness, and they pleaded no similarly egregious facts.

not have their serious medical needs met with deliberate indifference. *See, e.g., Hare*, 74 F.3d at 645; *Thompson*, 245 F.3d at 457; *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020); *see also Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393–94 (5th Cir. 2000). They also refer to cases holding that a plaintiff can demonstrate a violation of his constitutional rights by showing that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Domino*, 239 F.3d at 758.

Broad general propositions, however, are not enough to show that the constitutional right at issue was "clearly established." *Cope*, 3 F.4th at 205 (citing *Baldwin*, 964 F.3d at 326). The Stapletons were required to identify a case in which an officer who did not obtain medical treatment for a detainee exhibiting symptoms consistent with significant intoxication was held to have violated the Constitution. Their failure to provide a factually comparable case forecloses the Stapleton's ability to overcome the officers' qualified immunity.

IV

The parties disagree about whether the Stapletons pleaded an individual failure-to-train claim against Chief Solis in addition to their *Monell* claim against the City of Progreso. The Stapletons contend the complaint alleges that Chief Solis created a policy requiring officers to leave inmates unmonitored if they received other calls and failed to train his officers on how to spot medical issues.

A

To establish *Monell* liability, a plaintiff must show that an official policy promulgated by a municipal policymaker was the moving force behind the violation of a constitutional right. *Henderson v. Harris Cnty.,* 51 F.4th 125, 130 (5th Cir. 2022). A "failure-to-train action is a type of *Monell* claim." *Id.* (quoting *Hutcheson v. Dallas Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021)). To establish *Monell* liability on a failure-to-train theory, a plaintiff must prove that: "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Id.*

The Stapletons' complaint alleges that the City "had a policy, custom, or practice of allowing its officers to leave inmates unattended when responding in locations other than the police station." It also alleges that the City had a policy, custom, or practice of "not checking on inmates at least once each hour and ensuring their health and safety." Chief Solis is not mentioned in the section of the complaint describing the policies, customs, or practices that allegedly caused Stapleton's death.

The section of the complaint describing the "failure to train or inadequate training" alleges that the City is "tasked with the training of peace officers acting as jail and medical staff in ensuring inmate safety and medical treatment." It further alleges that the training provided to Officers Lozano and Becerra was "woefully inadequate," and that Chief Solis's "promulgation and perpetuation" of the problematic policies demonstrates deliberate indifference. This is the only reference to Chief Solis in the section. As conceded at oral argument, Chief Solis is the official responsible

for promulgating and perpetuating these policies on behalf of the City. This sole mention of him is consistent with a *Monell* claim. The complaint cannot be fairly read as providing fair notice of an individual failure-to-train claim against Chief Solis.

B

Even if the Stapletons did plead a failure-to-train claim against Chief Solis individually, they failed to sufficiently plead deliberate indifference.

To succeed on a claim of failure to train or supervise, a plaintiff must demonstrate that: (1) the defendant failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (quoting *Thompson*, 245 F.3d at 459).

The plaintiff must establish that the supervisor acted, or failed to act, with deliberate indifference to violations committed by their subordinates. *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009). The test cannot be met absent an underlying constitutional violation. *Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006) (citing *Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir.2000)). Indeed, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

The Stapletons' complaint does not establish the third prong of the failure-to-train claim for two reasons. First, "[this] test cannot be met if there is no underlying constitutional violation." *Rios*, 444 F.3d at 425. *See also Breaux*, 205 F.3d at 161 ("[T]he fact that Plaintiffs' First Amendment rights were not actually infringed exonerates [the supervisor] from supervisory liability."). As discussed, the officers did not demonstrate a "wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (5th Cir. 2001) (internal quotation marks omitted) (quoting *Johnson*, 759 F.2d at 1238). They did not violate Stapleton's constitutional rights.

Second, the Stapletons alleged no "pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. The Stapletons allege that "Chief Solis had a policy of failing to adequately monitor inmates and ignoring their needs," and "all inmates held at the Progreso jail would be left unsupervised for periods of time under the policy if the officers received other calls." Their allegation that a problematic policy exists—and that this policy could violate a detainee's constitutional rights—is not enough to overcome qualified immunity. The Stapletons do not allege or point to a pattern of similar constitutional violations within the Progreso Police Department, including officers' failure to monitor detainees, which amounted to deliberate indifference to detainees' serious medical needs, and resulting substantial harm. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62.

V

The district court's denial of the motion to dismiss based on qualified immunity is REVERSED.